

FILED
CLERK, U.S. DISTRICT COURT

JUL 27 2005

CENTRAL DISTRICT OF CALIFORNIA
BY



ENTERED
CLERK, U.S. DISTRICT COURT

JUL 28 2005

CENTRAL DISTRICT OF CALIFORNIA
BY                              DEPUTY

Priority
Send
Enter
Closed
JS-5/JS-6
JS-2/JS-3
Scan Only

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CECILIA G., by her next friend John G.; and KEYAN M., by her next friend JANE M. | CV 04-7275 SVW(AJWx) |
| Plaintiffs, | ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |
| v. | |
| ANTELOPE VALLEY UNION HIGH SCHOOL DISTRICT; DAVID J. VIERRA, Superintendent of Antelope Valley Union High School District in his official capacity; LOS ANGELES COUNTY OFFICE OF EDUCATION; DARLINE P. ROBLES, Superintendent of Schools and Chief Executive Officer of Los Angeles County Office of Education in her official capacity, | |
| Defendants. | |

THIS CONSTITUTES NOTICE OF ENTRY
AS REQUIRED BY FRCP, RULE 77(d).

DOCKETED ON CM

JUL 28 2005

BY _____ 001

## I.    INTRODUCTION

This case is about equality: what it means, what it requires, and whether a program administered by the Los Angeles County Office of Education for pregnant and parenting high school students provides it.

On September 1, 2004, Plaintiffs Cecilia G. and Keyana M. (collectively "Plaintiffs") filed this action for injunctive and declaratory relief under Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. §§ 1681-1688, against Defendants Antelope Valley Union High School District ("AVUHSD"), David Vierra ("Vierra") in his capacity as the Superintendent of the AVUHSD, the Los Angeles County Office of Education ("LACOE"), and Darline P. Robles ("Robles") in her capacity as the Superintendent and Chief Executive Officer of LACOE (collectively "Defendants").[1]

Plaintiffs are pregnant and/or parenting high school students. In their complaint, they allege that Defendants' administration of a state-funded program for pregnant and parenting high school students in the Antelope Valley discriminates against pregnant and parenting high school students by offering them a Hobson's choice — either forgo child care or receive an education which is not comparable to that received by the general high school student population in the AVUHSD.

Specifically, Plaintiffs allege that Defendants' administration of the program violates (1) Title IX and 34 C.F.R. § 106.40(b)(1), (2) the Equal Protection Clause of the Fourteenth Amendment, (3) the Due Process Clause of the Fourteenth Amendment, (4) the Equal Protection Clause of the California Constitution, (5) the Due Process Clause of the California Constitution, (6) California Education Code §§ 220 et seq. and §§ 54740 et seq., (6) the Unruh Civil Rights Act, California Civil Code §§ 51 et seq., and (7) California Government Code § 11135.

---

[1]  Plaintiffs are minors proceeding under fictitious names.  The action is brought on behalf of all similarly situated students.

1    On March 31, 2005, the parties stipulated to the dismissal of the

2  fourth, fifth, sixth, seventh, and eighth claims for relief - i.e.,

3  the state law claims.  Accordingly, the only remaining claims are

4  federal.

5    On May 10, 2005, Plaintiffs dismissed Defendants AVUHSD and

6  Vierra pursuant to a settlement agreement reached on or about April

7  25, 2005.  Accordingly, LACOE and Robles are the only remaining

8  Defendants.

9    On May 31, 2005, Defendants LACOE and Robles filed Defendants'

10  Motion for Summary Judgment.  On June 14, 2005, Plaintiffs filed

11  Plaintiffs' Memorandum of Points and Authorities in Opposition to

12  Defendants' Motion for Summary Judgment.  On June 21, 2005, Defendants

13  LACOE and Robles filed Defendants' Memorandum of Points and

14  Authorities in Reply to Plaintiff's Opposition to Defendants' Motion

15  for Summary Judgment.

16    For the reasons set forth below, the Court DENIES Defendants'

17  Motion for Summary Judgment.

18

19  **II.   FACTS[2]**

20    In 1998, the California Legislature established the California

21  School Age Families Education Program ("Cal-SAFE").  Cal. Educ. Code

22  §§ 54740 et seq.  The Legislature's intent in enacting Cal-SAFE was

23  _____

24  [2] In light of the evidence offered by the parties and the Court's
   rulings on their various evidentiary objections, the following
25  facts may be deemed undisputed for purposes of this motion.  Of
   course, as this is a motion for summary judgment, the Court must
26  view the evidence in the light most favorable to Plaintiffs and
   draw all reasonable inferences in their favor.  See, e.g.,
27  Playboy Enters., Inc. v. Netscape Communications Corp., 354 F.3d
28  1020, 1023 (9th Cir. 2004).

1    to establish a comprehensive, continuous, and community

2    linked school-based program that focuses on youth

3    development and dropout prevention for pregnant and

4    parenting pupils and on child care and development

5    services for their children for the purpose of

6    improving results for approximately 60,000 pupils and

7    their children.

8   § 54742(a).

9       The administration of Cal-SAFE is entrusted to local school

10  districts or county superintendents of schools.   See generally §

11  54745.  However, participation by school districts and county

12  superintendents of schools is voluntary.   § 54745(a)(1).

13      In implementing a Cal-SAFE program, local school districts and

14  county superintendents of schools are required to, among others

15  things, (1) comply with the regulations adopted pursuant to Title IX,

16  (2) ensure that enrolled pupils retain their right to participate in

17  any comprehensive school or alternative programs in which they could

18  otherwise enroll, (3) enroll pupils into the Cal-SAFE program on an

19  open entry and open exit basis, (4) provide a quality education

20  program to pupils in a supporting and accommodating learning

21  environment with appropriate classroom strategies to ensure school

22  access and academic credit for all work completed, (5) provide

23  parenting education and life skills instruction, and (6) provide a

24  quality child care and development program for the children of

25  enrolled teen parents located on or near the schoolsite.   § 54745(c).

26      LACOE administers the Cal-SAFE program in the Antelope Valley

27  ("AV Cal-SAFE" or the "Program"). The AV Cal-SAFE program is open to

28

1   students living in Lancaster or Palmdale, regardless of whether they

2   are already enrolled in schools in the AVUHSD.

3       Presently, LACOE administers the Program on three (3) different

4   campuses in the AVUHSD.  The Program is not available on all campuses.

5       Currently about 60 or 70 students are enrolled in the Program.

6   If a qualifying student enters the Program, he or she may later exit

7   the Program and still later re-enter it.

8       By statute, both male and female pupils are eligible to enroll in

9   Cal-SAFE so long as they meet certain eligibility criteria.   §

10  54747(c).  These eligibility criteria are: (1) the pupil must be 18

11  years of age or younger, (2) the pupil must be an expectant parent,

12  the custodial parent, or the non-custodial parent taking an active

13  role in the care and supervision of the child, and (3) the pupil may

14  not have earned a high school diploma or its equivalent.   § 54747(a).

15  In certain limited circumstances, students over the age of 18 are

16  eligible to enroll.   § 54747(b),(e).

17      Under the Program as administered by LACOE, a qualifying student

18  is required to attend 240 minutes of instruction in a self-contained

19  classroom staffed by LACOE instructors.  In addition, students

20  enrolled in the Program may take up to four (4) additional classes at

21  the host comprehensive high school, although their ability to do so

22  may be constrained.[3]  Students enrolled in the Program may also

23

24

_____

25  [3] Plaintiffs contend that, as a practical matter, AV Cal-SAFE
26  students can only take up to two additional classes because they
    would need to stay past the end of the regular school day in
27  order take any additional classes and child care services are not
    available past the regular school day.  Defendants dispute both
28  of these claims.

5

participate in other school activities, including clubs, dances, athletics, and student organizations.[4]

In order to qualify for admission to schools within the University of California system, California high school students must complete a set of 15 year-long high school courses, known as the "A-G" courses. The required "A-G" courses are: two years of history/social science, four years of English, three years of math (four recommended), two years of laboratory science (three recommended), two years of a foreign language (three recommended), one year of visual/performing arts, and one year of a college preparatory elective.  At least seven of the 15 year-long courses must be taken in the last two years of high school.

The high schools where AV Cal-SAFE classrooms are located offer a multitude of A-G courses, foreign language, advanced placement, laboratory science, and other electives.  However, students enrolled in AV Cal-SAFE cannot take foreign language, laboratory science, or advanced placement classes in any of the three AV Cal-SAFE classrooms.[5] Because of the unavailability of foreign language, lab science, visual/performing arts, and advanced placement classes in the AV Cal-SAFE classrooms, AV Cal-SAFE students who wish to attend a

---

[4] Plaintiffs contend that, as a practical matter, AV Cal-SAFE students are generally not able to participate in extracurricular activities because such activities generally take place after the end of the regular school day and child care services are not available past the regular school day.  Defendants dispute the assertion that child care services are not available past the regular school day.

[5] Defendants note that all of these classes are available at the host high schools and are thus available to students enrolled in the Cal-SAFE program.

6

1  University of California campus must enroll in a minimum of six

2  courses outside of the Cal-SAFE classroom in order to complete the A-G

3  requirements, assuming that some AV Cal-SAFE classes meet the UC

4  criteria and are considered A-G.

5  The minimum number of credits required to obtain a diploma from

6  AVUHSD is 230 credits.  LACOE's AV Cal-SAFE program requires only 220

7  credits for graduation.[6]  AV Cal-SAFE students who only take classes

8  in the self-contained classroom cannot qualify for an AVUHSD diploma

9  and cannot participate in the host high school's graduation ceremony.[7]

10  An AV Cal-SAFE student must enroll in three additional courses to meet

11  the AVUHSD graduation requirements, including two classes of Physical

12  Education and one class for the "Senior Project."

13  Plaintiffs claim that Charlene Packard, who supervises the AV

14  Cal-SAFE classroom located on the campus of Antelope Valley High

15  School, possesses a "Life General Elementary Teaching Credential" that

16  authorizes her to teach solely in grades kindergarten to eight.

17  However, Defendants contend that Charlene Packard is  qualified to

18  teach by virtue of Cal. Educ. Code § 44865, which provides in relevant

19  part:

20      A valid teaching credential issued by the State Board

21      of Education or the Commission for Teacher Preparation

22      and Licensing, based on a bachelor's degree, student

23

24  [6] Defendants note that students enrolled in the Program have the
    option of taking additional classes and units to receive the
25  AVUHSD diploma.

26  [7] While Defendants acknowledge that a student who takes only AV
    Cal-Safe classes cannot qualify for an AVUHSD diploma, they note
27  that such students do receive a diploma issued LACOE and may
28  participate in a county-wide graduation ceremony.

1   teaching, and special fitness to perform, shall be

2   deemed qualifying for assignment as a teacher in the

3   following assignments, provided that the assignment of

4   a teacher to a position for which qualifications are

5   prescribed by this section shall be made only with the

6   consent of the teacher: ... (f) Alternative schools.

7   § 44865(f).  According to Defendants, because the AV Cal-SAFE

8   classroom is an alternative school or classroom within the meaning of

9   Cal. Educ. Code  § 44865(f), Charlene Packard and her colleagues

10  within the AV Cal-SAFE classes are qualified to teach under California

11  law.

12      According to the testimony of Plaintiff Cecilia G. and other AV

13  Cal-SAFE students, students in the Program learn all academic subjects

14  solely through the use of written instructional materials.  Although

15  each classroom has one teacher and one teacher's aide, the teacher and

16  teacher's aide do not provide or only rarely provide oral instruction.

17  In general, they monitor the students and will occasionally answer

18  students' questions.  Several of the students testify that the AV Cal-

19  SAFE classroom is "like independent study."  (Cecilia G. Decl. ¶ 23;

20  Anaya J. Decl. ¶ 26.)[8]

21      LACOE receives funding for the AV Cal-SAFE program from the

22  California Department of Education ("CDE").  It currently receives

23  approximately $13,000 per year for each student enrolled in the

24  _____

25  [8] Defendants have submitted declarations from instructors who
    dispute the claim that there is no lecturing or oral instruction

26  in the Cal-SAFE programs administered by LACOE.  However, the
    instructors whose declarations Defendants have submitted did not

27  teach in the particular class at issue.  In any event, the Court
    would have to accept the students' testimony for purposes of this

28  motion.

1  Program.  LACOE presently contracts with private child care providers

2  to provide child care to the children of AV Cal-SAFE students.

3      Defendants contend that the funding for the Program is generated

4  by submission to the State of figures showing the Average Daily

5  Attendance ("ADA") of students in the Program.  According to

6  Defendants, LACOE must provide 240 minutes of instruction with the

7  framework of the self-contained AV Cal-SAFE classes in order to claim

8  the ADA reimbursement.  Thus, Defendants argue that allowing students

9  to take less than the required 240 minutes of instruction within the

10 self-contained AV Cal-SAFE classes would eliminate the Program's sole

11 source of funding.

12     Plaintiffs contend that LACOE may provide Cal-SAFE support

13 services while contracting out the required 240 minutes of educational

14 services to the school district.  According to Plaintiffs, such an

15 arrangement would allow LACOE to continue to obtain funding from the

16 state for each enrolled Cal-SAFE student and compensate the school

17 district for the educational service.

18

19 **III. DISCUSSION**

20     Defendants LACOE and Robles move for summary judgment.

21 Plaintiffs oppose on the merits but also seek a continuance pursuant

22 to Rule 56(f) so that they may take additional discovery.

23

24     A.   Title IX Claim

25     When Congress enacted Title IX in 1972, it sought to achieve two

26 goals: (1) "to avoid the use of federal resources to support

27 discriminatory practices" and (2) "to provide individual citizens

28

1 effective protection against those practices." <u>Cannon v. University</u>

2 <u>of Chicago</u>, 441 U.S. 677, 704, 99 S. Ct. 1946 (1979). These goals are

3 reflected in §§ 901 and 902 of Title IX.

4     Section 901 provides in relevant part that "[n]o person in the

5 United States shall, on the basis of sex, be excluded from

6 participation in, be denied the benefits of, or be subjected to

7 discrimination under any education program or activity receiving

8 Federal financial assistance...." 20 U.S.C. § 1681(a). Section 902

9 commits the enforcement of Title IX to "[e]ach Federal department or

10 agency" which extends Federal financial assistance to education

11 programs or activities. § 1681.

12     Early in the history of Title IX, the Supreme Court addressed the

13 issue of whether a private litigant may bring an action under Title

14 IX. In <u>Cannon v. University of Chicago</u>, 441 U.S. at 709, the Supreme

15 Court held that an implied private right of action exists under Title

16 IX. Since <u>Cannon</u>, the Supreme Court has dramatically expanded the

17 scope of the private right of action under Title IX. <u>See, e.g.,</u>

18 <u>Jackson v. Birmingham Bd. of Educ.</u>, 125 S. Ct. 1497 (2005) (holding

19 that retaliation against a person because that person has complained

20 of sex discrimination is a form of sex·discrimination encompassed by

21 Title IX's private cause of action); <u>Davis v. Monroe County Bd. of</u>

22 <u>Educ.</u>, 526 U.S. 629, 119 S. Ct. 1661 (1999) (holding that a private

23 damages action may lie against a school board under Title IX in cases

24 of student-on-student harassment, but only where the funding recipient

25 acts with deliberate indifference and the harassment is so severe that

26 it effectively bars the victim's access to an educational opportunity

27 or benefit); <u>Gebser v. Lago Vista Indep. Sch. Dist.</u>, 524 U.S. 274, 118

28

1   S. Ct. 1989 (1998) (holding that a teacher's sexual harassment of a

2   student can give rise to a private right of action under Title IX

3   where there is actual notice to the school district and the school

4   district's response amounts to deliberate indifference to the

5   teacher's conduct); <u>Franklin v. Gwinnett County Pub. Sch.</u>, 503 U.S.

6   60, 76, 112 S. Ct. 1028 (1992) (holding that money damages are

7   available in private actions brought under Title IX).

8      The Department of Education ("DOE") is presently the primary

9   administrative agency charged with enforcing Title IX. <u>Cohen v. Brown</u>

10   <u>Univ.</u>, 991 F.2d 888, 895 (1st Cir. 1993). Pursuant to its authority

11   under § 902, DED promulgated 34 C.F.R. § 106.40. Section 106.40

12   provides in relevant part:

13      A recipient shall not discriminate against any student

14      from its education program or activity, including any

15      class or extracurricular activity, on the basis of such

16      student's pregnancy, childbirth, false pregnancy,

17      termination of pregnancy or recovery therefrom, unless

18      the student requests voluntarily to participate in a

19      separate portion of the program or activity of the

20      recipient.

21   34 C.F.R. § 106.40(b)(1).

22      Section 106.40 further provides:

23      A recipient which operates a portion of its education

24      program or activity separately for pregnant students,

25      admittance to which is completely voluntary on the part

26      of the student as provided in paragraph (b)(1) of this

27

28

1    section shall ensure that the separate portion is

2    comparable to that offered to non-pregnant students.

3   34 C.F.R. § 106.40(b)(3).

4       Thus, under § 106.40, a recipient operating a separate program

5   for pregnant students must ensure that the separate program is

6   "comparable" to the educational program offered to non-pregnant

7   students and that admittance to the separate program is "completely

8   voluntary." Since there is no dispute that LACOE receives federal

9   funding and is subject to the requirements of Title IX and its

10  regulations – indeed, Cal-SAFE itself mandates that school districts

11  and county superintendents of schools ensure that their Cal-SAFE

12  programs be in compliance with the regulations adopted pursuant to

13  Title IX, see Cal. Educ. Code § 54745(c)(1) – it is clear that LACOE's

14  administration of AV Cal-SAFE must comply with § 106.40. The only

15  question is whether it does.[9]

16      Plaintiffs contend that LACOE's administration of AV Cal-SAFE is

17  not in compliance with § 106.40 because admittance is not "completely

18  voluntary" and because the educational program offered under AV Cal-

19  SAFE is not "comparable" to that offered to non-pregnant high school

20  students in AVUHSD. Defendants disagree. To some extent (but not

21  _____

22  [9] In fact, there is a significant threshold issue which neither
    party addresses but which is, properly speaking, antecedent to
23  the question of whether LACOE is in compliance with § 106.40.
    That issue is whether the private right of action under Title IX
24  encompasses claims under § 106.40 since the language of § 106.40
    seems at first blush to go beyond a mere prohibition on sex
25  discrimination and since the Program does not, at least facially,
    discriminate on the basis of sex. As the Supreme Court's
26  decision in Alexander v. Sandoval, 532 U.S. 275, 121 S. Ct. 1511
    (2001), makes clear, this is no small issue. For a recent case
27  applying Sandoval to Title IX, see Barrett v. West Chester Univ.
    of Pa., 2003 WL 22803477 (E.D. Pa. Nov. 12, 2003).
28

1 entirely), their disagreement boils down to a question of statutory

2 interpretation: what do the terms "completely voluntary" and

3 "comparable" mean?

4

5       1.   What Do the Terms "Completely Voluntary" and

6            "Comparable" Mean?

7     The meaning of the terms of "completely voluntary" and

8 "comparable" is a question of statutory interpretation.  In dealing

9 with questions of statutory interpretation, courts look first to the

10 plain meaning of the statute's language.  See, e.g., See also Robinson

11 v. Shell Oil Co., 519 U.S. 337, 340, 117 S. Ct. 843 (1997) ("[The]

12 first step in interpreting a statute is to determine whether the

13 language at issue has a plain and unambiguous meaning with regard to

14 the particular dispute in the case."); Botosan v. Paul McNally Realty,

15 216 F.3d 827, 831 (9th Cir. 2000) ("Statutory interpretation begins

16 with the plain meaning of the statute's language.").  If the plain

17 meaning is unambiguous, it controls.  See, e.g., id. ("Where the

18 statutory language is clear and consistent with the statutory scheme

19 at issue, the plain language of the statute is conclusive and the

20 judicial inquiry is at an end."); Children's Hosp. & Health Ctr v.

21 Belshie, 188 F.3d 1090, 1096 (9th Cir. 1999) ("When the plain meaning

22 of a statutory provision is unambiguous, that meaning is

23 controlling.").  Moreover, if the statute explicitly defines the term,

24 that definition controls, even if it diverges from what the court

25 perceives to be the plain meaning of the term.  Stenberg v. Carhart,

26 530 U.S. 914, 942, 120 S. Ct. 2597 (2000) ("When a statute includes an

27

28

1  explicit definition, [courts] must follow that definition, even if it

2  varies from that term's ordinary meaning.").

3

4          a.   What Does the Term "Completely Voluntary" mean?

5          Section 106.40 does not define the phrase "completely voluntary"

6  and there is no case law interpreting the phrase.  Accordingly, the

7  Court must look to the ordinary meaning of the word.  Microsoft Corp.

8  v. Comm'r of Internal Revenue, 311 F.3d 1178, 1183 (9th Cir. 2002)

9  ("Where the text of a statute contains undefined terms, [courts] will

10 construe those terms to have their ordinary meaning."); Romine v.

11 Diversified Collection Servs., Inc., 155 F.3d 1142, 1145 (9th Cir.

12 1998) ("In the absence of a statutory definition, a statutory term

13 will be accorded its ordinary meaning.").

14         In determining the ordinary meaning of words, courts will often

15 look to their dictionary definition.  See, e.g., United States v.

16 Mendoza, 244 F.3d 1037, 1042 (9th Cir. 2001); United States v.

17 Mohrbacher, 182 F.3d 1041, 1048 (9th Cir. 1999).  Webster's Ninth New

18 Collegiate Dictionary provides the following definitions of

19 "voluntary":

20         1: proceeding from the will or from one's own choice or

21         consent 2: unconstrained by interference: self-

22         determining 3: done by design or intention: INTENTIONAL

23         <~ manslaughter> 4: of, relating to, subject to, or

24         regulated by the will <~ behavior> 5: having power of

25         free choice < man is a ~ agent> 6: provided or

26         supported by voluntary action < a ~ hospital> 7: acting

27

28

1  or done on one's own free will without valuable

2  consideration or legal obligation.

3  Webster's Ninth New Collegiate Dictionary 1322 (1987).

4  Although they cite to a different dictionary, Plaintiffs seize

5  upon definitions of the word which essentially correspond to the

6  second and seventh definitions, namely, "unconstrained by

7  interference" and "acting or done on one's own free will without

8  valuable consideration or legal obligation."  In Plaintiffs' view,

9  these definitions come closest to matching the ordinary, everyday

10  meaning of the word.  For instance, Plaintiffs point out that these

11  definitions closely approximate the definition of "voluntariness"

12  which has been fashioned by the courts in the criminal procedure

13  context.  See, e.g., Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.

14  Ct. 2041 (1973).  Likewise, Plaintiffs note that courts in the

15  employment discrimination and procedural due process context have

16  recognized that even ostensibly voluntary resignations and retirements

17  may not have been truly voluntary.  See, e.g., Shoaf v. Dep't of

18  Agric., 260 F.3d 1336, 1341 (Fed. Cir. 2001) ("As a general

19  proposition, to establish involuntariness on the basis of coercion

20  this court requires an employee to show: (1) the agency effectively

21  imposed the terms of the employee's resignation or retirement; (2) the

22  employee had no realistic alternative but to resign or retire; and (3)

23  the employee's resignation or retirement was the result of improper

24  acts by the agency."); Leheny v. City of Pittsburgh, 183 F.3d 220, 228

25  (3d Cir. 1999) ("There appear to be two circumstances in which an

26  employee's resignation or retirement will be deemed involuntary for

27  due process purposes: (1) when the employer forces the resignation or

28

1 retirement by coercion or duress, or (2) when the employer obtains the

2 resignation or retirement by deceiving or misrepresenting a material

3 fact to the employee."); Burks v. Oklahoma Pub. Co., 81 F.3d 975, 978

4 (10th Cir. 1996) ("To prove constructive discharge, the employee must

5 show that her employer by its illegal discriminatory acts has made

6 working conditions so difficult that a reasonable person in the

7 employee's position would feel compelled to resign.") (internal

8 quotation marks omitted); Bourque v. Powell Elec. Mfg. Co., 617 F.2d

9 61, 65 (5th Cir. 1980) ("The general rule is that if the employer

10 deliberately makes an employee's working conditions so intolerable

11 that the employee is forced into an involuntary resignation, then the

12 employer has encompassed a constructive discharge and is as liable for

13 any illegal conduct involved therein as if it had formally discharged

14 the aggrieved employee.").

15    Although Plaintiffs' arguments are not without force, the Court

16 finds their proposed definitions unworkable and strangely disconnected

17 from the very regulations at issue.  First, their proposed definitions

18 are simply unworkable.  According to Plaintiffs, a student's choice is

19 voluntary within the meaning of the regulation only when it is

20 unconstrained by external circumstances and when it is not influenced

21 by the prospect of valuable consideration.  In life, however, one's

22 choices are never unconstrained.  This is especially true of pregnant

23 and parenting high school students.  Accordingly, under Plaintiffs'

24 definition, no program could comply with § 106.40 because the choices

25 of pregnant or parenting high school students will always be

26 constrained by the hardships they face.  Section 106.40 would thereby

27 be rendered an absurdity for it would preclude the very possibility (a

28

1  separate program for pregnant students) that it expressly provides

2  for.  This Court cannot countenance such an absurd result.  See, e.g.,

3  Griffin v. Oceanic Contractors, Inc., 458 U.S. 564, 575, 102 S. Ct.

4  3245 (1982) (noting that "interpretations of a statute which would

5  produce absurd results are to be avoided"); Sorrels v. United States,

6  287 U.S. 435, 446, 53 S. Ct. 210 (1932) ("Literal interpretation of

7  statutes at the expense of the reason of the law and producing absurd

8  consequences or flagrant injustice has frequently been condemned.");

9  Holy Trinity Church v. United States, 143 U.S. 457, 460, 12 S. Ct. 511

10  (1892) ("If a literal construction of the words of a statute be

11  absurd, the act must be so construed as to avoid the absurdity.").

12  Moreover, to the extent that any program such as AV Cal-SAFE which

13  offers child-care benefits to enrollees but not non-enrollees is

14  undeniably offering valuable consideration in exchange for enrollment,

15  it will stand condemned as coercive under Plaintiff's definition.

16  Such a definition defies common sense.

17      Second, the Court finds Plaintiffs' proposed definitions

18  strangely disconnected from the regulations at issue.  After all, the

19  use of the word "voluntary" in the criminal procedure and employment

20  contexts does not necessarily have any bearing on how the word is

21  being used in the regulations at issue here.  In the criminal

22  procedure context, after all, the concern is that the police may use

23  physical force, the threat of physical force, or psychological

24  pressure to extract a confession from the suspect.  In the employment

25  law context, the concern is that an employer will make life so

26  intolerable for an employee that she has no realistic alternative but

27  to resign.  By contrast, the concern in the instant context is not

28

1   that school administrators will use physical force or coercive

2   psychological tactics to pressure students into enrolling in Cal-SAFE

3   or that they will make life so intolerable for students who do not

4   enroll that they will have no realistic option but to enroll.  Rather,

5   the concerns are that (1) students will be automatically herded into

6   such programs and/or (2) students will not receive the information

7   necessary to make an intelligent decision whether or not to enroll.

8   Accordingly, analogies to the criminal procedure and employment law

9   context are simply not apt.  Moreover, there is no reason to suppose

10   that the drafters of the regulation intended to import the use of the

11   word in those contexts into this context.  Indeed, the word

12   "voluntary" is used in the regulation in conjunction with the word

13   "request," a word which hardly evokes either the criminal procedure or

14   employment law contexts.  See § 106.40(b)(1) ("A recipient shall not

15   discriminate against any student from its education program or

16   activity, including any class or extracurricular activity, on the

17   basis of such student's pregnancy, childbirth, false pregnancy,

18   termination of pregnancy or recovery therefrom, unless the student

19   requests voluntarily to participate in a separate portion of the

20   program or activity of the recipient.") (emphasis added).

21   Accordingly, we are dealing here with the issue of whether a

22   request to enroll in a particular program is voluntary.  This is very

23   different issue from the issue of whether a suspect's confession or an

24   employee's resignation is voluntary.  Plaintiffs' suggestion that the

25   Court look to the uses of the word "voluntary" in the criminal

26   procedure and employment contexts makes no concession to this fact.

27

28

1    Instead of looking to the criminal procedure and employment

2  contexts, the Court finds that it would be more useful to look to the

3  tort context.  A voluntary request to participate in a particular

4  educational program is more analogous to the decision to undergo a

5  particular course of medical treatment than it is to a confession or a

6  resignation.  Like a patient deciding to undergo a particular course

7  of treatment, a pregnant or parenting student is making a choice which

8  is undeniably constrained, which is in some ways the product of

9  circumstances beyond the person's control, and which is likely a

10  choice between the lesser of two evils.  In both cases, the choice is

11  an unenviable one.  Moreover, it is one that has a price tag.

12  Whichever choice a patient makes, that choice carries with it certain

13  costs and benefits.  So, too, a pregnant or parenting student choosing

14  between educational programs, is making a choice that will ineluctably

15  carry with it certain costs and benefits.  Therefore, as with the

16  patient, the student must carefully balance those costs and benefits.

17  Given these similarities, the Court finds that the standard for

18  voluntariness in the informed consent context better captures the

19  meaning of the word "voluntary" in § 106.40 than the standard for

20  voluntariness in the criminal procedure or the employment

21  discrimination contexts.  After all, in ordinary, everyday language,

22  the word "voluntary" typically means nothing more than "not forced" or

23  "not the product of external compulsion."  See, e.g., Webster's Ninth

24  New Collegiate Dictionary 1322 (1987) (explaining in the notes

25  accompanying the definitions above that the term "voluntary" is

26  generally used to "impl[y] freedom and spontaneity of choice or action

27  without external compulsion.").  The Court, however, declines to adopt

28

19

a definition of "voluntary" which means simply "without external compulsion" because it finds that the context at issue here requires more.  First, we are dealing with minors.  Second, we are dealing with minors who are making a choice of some consequence.  Third, the regulations speak of a "completely voluntary" choice.  § 106.40(b)(3).  Unless the word "completely" is mere surplusage, it would seem to require something more than simply the lack of external compulsion.  Accordingly, and as more fully set forth below, the Court finds that the voluntariness standard under § 106.40 requires that the student be adequately informed of the nature of her choice.

The informed consent standard has traditionally been defined in terms of a doctor's duty to disclose "all risks which are material," W. Page Keeton, Dan B. Dobbs, Robert E. Keeton, & David G. Owen, Prosser and Keeton on Torts § 32, at 191 (5th ed. 1984), or that information which "a prudent person would require in order to make an intelligent decision."  In re Swine Flu Immunization Prods. Liab. Litig., 533 F. Supp. 567, 576 (D. Colo. 1980).  There are, of course, other formulations, but these tests capture the gist of what voluntariness under § 106.40 would seem to require – namely, that (1) the student be allowed to choose whether or not to enroll in the program (i.e., that he or she not be automatically enrolled) and (2) the student be informed of all information necessary to make an intelligent decision whether or not to enroll in the program.

### b. What Does the Term "Comparable" Mean?

Since § 106.40 does not define the term "comparable" and there is no case law interpreting the term, the Court must again look to the

ordinary meaning of the word, as reflected in its dictionary definition.[10] The dictionary defines "comparable" as "equivalent; similar." Webster's Ninth New Collegiate Dictionary 267 (1987). Although the word "equivalent" implies a closer correspondence than "similar," neither words suggests complete identity. Thus, a separate program for pregnant students need not be identical to the program offered to non-pregnant students. Nevertheless, there must be an equivalence between the programs.

Of course, this begs the question of what constitutes equivalence. In Jeldness v. Pearce, 30 F.3d 1220 (9th Cir. 1994), female prisoners in Oregon alleged that the Oregon State Department of Corrections was discriminating against them in violation of Title IX because the educational and vocational programs available to female prisoners were inferior to those available to male prisoners. Although it involved an institutional context (prisons) very different from the one at issue here (high schools) and did not involve the precise regulation at issue here, Jeldness is instructive if only because the court in that case was faced with an issue similar to the one this Court faces, namely, what equivalence means in situations in which there is segregation by sex.[11] In such a context, the court concluded, "strict one-for-one identity of classes" is not required,

---

[10] The term "comparable" is used elsewhere in the regulations promulgated by DOE, see 34 C.F.R. § 106.33, but the Court was unable to find any case law interpreting its use there.

[11] Since AV Cal-SAFE is open to men, it does not, strictly speaking, segregate on the basis of sex. Nevertheless, students who participate in the Program are segregated from the general high school population, and at present the only participants are women.

but "there must be reasonable opportunities for similar studies at the women's prison and women must have an equal opportunity to participate in educational programs." Id. at 1229. See also id. ("Although the programs need not be identical in number or content, women must have reasonable opportunities for similar studies and must have an equal opportunity to participate in programs of comparable quality."). Transposed to the instant context, this standard would seem to require that (1) students enrolled in the Program have a reasonable opportunity to take the same courses or range of courses as students not enrolled in the Program and (2) those classes which are offered as part of the Program be of similar quality as those offered to students not enrolled in the Program. This standard, the Court believes, best captures the meaning of the term "comparable" in § 106.40(b)(3). Although the Court acknowledges that the standard is somewhat burdensome, the Court does not see how any lesser standard can do justice to the ordinary meaning of "comparable" or the overall mandate of Title IX.[12]

> 2. Is the Program "Completely Voluntary" and "Comparable" to the Educational Program Offered to Non-Pregnant Students?

Having defined the relevant language, the Court must now determine whether there is a genuine issue of fact regarding the Program's compliance with it.

---

[12] The Court is not foreclosing further refinement of these definitions prior to trial and indeed will seek further briefing on this issue prior to trial.

1                  a.    Is Admittance to the Program "Completely

2                       Voluntary"?

3      Plaintiffs contend that admittance to the Program is not

4 completely voluntary because (1) pregnant or parenting students will

5 not receive child care services unless they enroll in the Program and

6 (2) LACOE does not adequately inform students of the nature of the

7 Program prior to enrollment.  As set forth above, the test of

8 voluntariness is whether (1) the student is allowed to choose whether

9 or not to enroll in the program and (2) the student is informed of all

10 information necessary to make an intelligent decision whether or not

11 to enroll in the program.  Under this standard, the fact that child

12 care services are available only to enrollees is utterly irrelevant to

13 the issue of whether or not the Program is voluntary.  So long as

14 students are not automatically enrolled in the Program, the fact that

15 child care services are available only to enrollees will not preclude

16 summary judgment for Defendants.  However, if, as Plaintiffs maintain,

17 LACOE does not adequately inform students of the nature of the Program

18 prior to enrollment, this fact would preclude summary judgment for

19 Defendants.

20      Defendants contend that they adequately inform students of the

21 nature of the Program prior to enrollment.  Their evidence consists of

22 flyers which are purportedly distributed to students who express an

23 interest in the Program.  The principal flyer states in relevant part:

24      If you are enrolled in a Cal-SAFE classroom located on

25      a high school campus:

26 •      You have the option to take as many as four

27        classes in the regular high school and still

28

1        receive Cal-SAFE benefits, including child care

2        and the prenatal/pregnancy or parenting classes

3     •    You can take classes that meet high school

4        graduation and college entrance requirements if

5        you qualify.  If you take classes in the Cal-SAFE

6        classroom, be aware that they may not meet the

7        requirements for college entrance.

8     •    You have the right to leave the Cal-SAFE program

9        at any time and return to your regular

10        neighborhood school.  If you exit, you can re-

11        enroll in Cal-SAFE at a later time as long as you

12        continue to meet the eligibility requirements.

13     •    You can participate in _all_ available school

14        programs, such as physical education, clubs,

15        sports, dances, graduation activities, and college

16        preparatory, honors, or AP classes, if you

17        qualify.   Even while you are pregnant, you can

18        participate in these programs.

19     •    If you miss school because of your pregnancy, your

20        child's illness, or doctor's appoints for you or

21        your child, your school must let you complete all

22        missed assignments and tests for academic credit.

23 (Flores Decl. ¶ 23, Ex. 1101.)

24      The other flyers contain additional information, including a

25 class schedule, but none of the flyers explains that students enrolled

26 in the Program receive all instruction solely through the use of

27 written  materials.  At the very least, the omission of this fact

28

1 suffices to create a triable issue of fact as to whether LACOE

2 adequately informs students of the nature of the Program such that

3 they are able to make an intelligent decision whether or not to

4 enroll.  Accordingly, summary judgment must be denied on this basis

5 alone.[13]

6       **b.**   Is the Program "Comparable" to the Educational Program

7          Offered to Non-Pregnant Students?

8     Plaintiffs contend that the Program is not "comparable" to the

9 educational offerings at the host comprehensive high schools because

10 (1) the classes which it offers are not taught by a teacher certified

11 in that subject and are not even "taught" in the traditional sense at

12 all (i.e., there is no oral instruction, only self-study) and (2) the

13 Program does not offer many of the classes which are needed to

14 graduate from AVUHSD or attend a University of California campus

15 (e.g., foreign language, lab science, AP classes).

16     While Defendants dispute Plaintiffs' claim that the instructors

17 in the Program are not certified, they do not dispute that the nature

18 of the instruction offered in AV Cal-SAFE classes (at least with

19 regard to the particular AV Cal-SAFE class at issue) or the fact that

20

---

21 [13] Moreover, the only testimony regarding the flyers comes from

22 David Flores, who does not claim to have personally handed the
flyers out to students.  Flores simply states that "[s]tudents

23 wishing information on the Cal-SAFE program receive explanatory
paperwork outlining the benefits and obligations of the Cal-SAFE

24 program.  Attached hereto as exhibit 1101 are true and correct
copies of the handouts and informational packets provided by

25 LACOE to interested students."  (Flores Decl. ¶ 23.)  Notably
absent from Flores' testimony is any testimony as to when LACOE

26 first started handing out the flyers or whether Plaintiffs
received the flyers.  Plaintiffs contend that the flyers were not

27 distributed until after their lawsuit was filed and only in
response to the filing of the lawsuit.  (Natarajan Decl. ¶ 26.)

28

1  the Program does not offer the courses Plaintiffs cite.[14]  Given these

2  facts, a rational fact finder could certainly conclude that the

3  educational program offered by AV Cal-SAFE is not of comparable

4  quality to that received by students attending the host campus.

5  Accordingly, summary judgment must be denied for this reason as well.

7  B.   Equal Protection Claim[15]

9  [14] Defendants argue that the fact that students are able to take
10  four classes outside of the Program makes the absence of foreign
   language classes and lab science classes irrelevant.  Moreover,
   Defendants argue that the nature of the instruction offered in
11  the Program is dictated by the fact that it is individually
12  tailored to the needs of the students.  Whatever the merit of
   these arguments, they are essentially factual arguments which a
13  rational fact finder could reject.
       More fundamentally, Defendants argue that the Program is an
14  "indivisible" whole which cannot be disaggregated without
   defunding the Program.  However, this argument, although clearly
15  relevant to Plaintiffs' constitutional claims, has no relevance
   here.  There is simply nothing in the applicable Title IX
16  regulations which allow a court to consider a program's funding
   mechanism in determining whether it satisfies the "comparability"
17  requirement.

18  [15] There is a threshold question with regard to Plaintiffs' equal
19  protection and due process challenges which neither party
   addresses, namely, whether the Supreme Court's decisions in
20  Middlesex County Sewerage Auth. v. Nat'l Sea Clammers Ass'n, 453
   U.S. 1, 101 S. Ct. 2615 (1981), Smith v. Robinson, 468 U.S. 992,
21  104 S. Ct. 3457 (1984), and City of Rancho Palos Verdes v.
   Abrams, 125 S. Ct. 1453 (2005), precludes Plaintiffs'
22  constitutional challenges.  In Pfeiffer v. Marion Ctr. Area Sch.
   Dist., 917 F.2d 779, 789 (3d Cir. 1990), the Third Circuit upheld
23  a district court's determination that Title IX represents a
   comprehensive enforcement scheme, the requirements of which may
24  not be bypassed by bringing suit under § 1983.  The Third Circuit
   reaffirmed its holding in Pfeiffer three years later in Williams
25  v. Sch. Dist. of Bethlehem, Pa., 998 F.2d 168, 176 (3d Cir.
   1993).  In Bruneau ex. rel. Schofield v. South Kortright Center
26  School District, 163 F.3d 749, 755-59 (2d Cir. 1998), the Second
27  Circuit reached the same conclusion.  Three other circuits have
   reached the opposite conclusion.  See Delgado v. Stegall, 367
28  F.3d 668 (7th Cir. 2004); Seamons v. Snow, 84 F.3d 1226 (10th

1    Plaintiffs claim that Defendants have discriminated and continue

2  to discriminate against them and the proposed Plaintiff class on the

3  basis of pregnancy and/or parental status in violation of the Equal

4  Protection Clause of the Fourteenth Amendment.

5    The Equal Protection Clause of the Fourteenth Amendment provides

6  that no State shall "deny to any person within its jurisdiction the

7  equal protection of the laws." U.S. Const. amend. XIV. "Unless a

8  statute provokes 'strict judicial scrutiny' because it interferes with

9  a 'fundamental right' or discriminates against a 'suspect class,' it

10 will ordinarily survive an equal protection attack so long as the

11 challenged classification is rationally related to a legitimate

12 governmental purpose." Kadrmas v. Dickinson Pub. Sch., 487 U.S. 450,

13 457-58, 108 S. Ct. 2481 (1988). Since education is not a fundamental

14 right or interest to which strict scrutiny attaches, see, e.g.,

15 Kadrmas, 487 U.S. at 458, 108 S. Ct. 2481; Plyler v. Doe, 457 U.S.

16 202, 221, 102 S. Ct. 2382 (1982); San Antonio Indep. Sch. Dist. v.

17 Rodriquez, 411 U.S. 1, 29-40, 93 S. Ct. 1278 (1973), and since

18 pregnancy is not equated with gender for purposes of equal protection

19 analysis, see Geduldig v. Aiello, 417 U.S. 484, 497 n.21, 94 S. Ct.

20 2485 (1974), the Program will survive equal protection review unless

21 Plaintiffs can demonstrate that it is not rationally related to any

22 legitimate governmental interest. See, e.g., RUI One Corp. v. City of

23 Berkeley, 371 F.3d 1137, 1155 (9th Cir. 2004) ("A person attacking the

24 rationality of [a] legislative classification has the burden to

25 negative every conceivable basis which might support it.") (internal

26

27 Cir. 1996); Lillard v. Shelby County Bd. of Educ., 76 F.3d 716

28 (6th Cir. 1996).

1   quotation marks omitted); <u>Silveira v. Lockyer</u>, 312 F.3d 1052, 1089

2   (9th Cir. 2003) ("[T]he burden falls upon the party attacking a

3   legislative classification reviewed under the rational-basis standard

4   to demonstrate that there is no reasonable basis for the challenged

5   distinction.").

6       Plaintiffs contend that the Program, as currently administered by

7   LACOE, is not reasonably related to any legitimate governmental

8   interest.  In particular, Plaintiffs contend that the Program is not

9   satisfying the very goals of Cal-SAFE, which are set forth at Cal.

10  Educ. Code § 54742(b).[16]  In response, Defendants argue that Program

11  is structured the way it is because it would not be financially viable

12  if it were structured in any other way.  In particular, Defendants

13  argue that it will lose its primary source of funding -- the so-called

14  ADA reimbursement -- if students are allowed to take part of the 240

15  minutes of instruction outside of the self-contained AV Cal-SAFE

16  classes.

17      While budgetary and fiscal concerns are undoubtedly a legitimate

18  government interest, <u>see, e.g., Lyng v. Int'l Union, United Auto.</u>

19  <u>Aerospace & Agric. Implement Workers of Am., UAW</u>, 485 U.S. 360, 373,

20  108 S Ct. 1184 (1988); <u>Ohio Bureau of Employment Servs. v. Hodory</u>, 431

21  U.S. 471, 493, 97 S. Ct. 1898 (1977); <u>Aleman v. Glickman</u>, 217 F.3d

22  1191, 1203 (9th Cir. 2000); <u>Rodriguez v. Cook</u>, 169 F.3d 1176, 1181

23  (9th Cir. 1998); <u>Sims v. Harris</u>, 607 F.2d 1253, 1257 (9th Cir. 1979),

24  Defendants have not adequately explained how the Program's alleged

25

26  [16] Of course, the Program need not be rationally related to the

27  precise goals articulated by the legislature in order to survive
    basis review.  <u>Fed. Communications Comm'n v. Beach</u>

28  <u>Communications</u>, 508 U.S. 307, 314-15, 113 S. Ct. 2096 (1993).

1 | deficiencies (e.g., the failure to provide oral instructional, the

2 | failure to provide certain kinds of classes) are related in any

3 | rational way to its financial solvency and/or its need to maintain the

4 | ADA reimbursement.  Even assuming that Cal. Educ. Code §§ 54749(a)(3)

5 | and 46300 have the net effect of requiring LACOE to provide 240

6 | minutes of self-contained instruction per day in order to receive the

7 | ADA reimbursement -- which is by no means evident from a plain reading

8 | of those provisions -- Defendants have not explained how the lack of

9 | oral instruction or foreign language instruction is related to the

10 | Program's self-contained nature.[17]  Nevertheless, as the Court finds

11 | that Plaintiffs are entitled a continuance with regard to their equal

12 |

---

[17] Defendants appear to be arguing that the combined effect of Cal. Educ. Code §§ 54749(a)(3) and 46300(a) is to require that county offices of education ("COEs") like LACOE provide 240 minutes per day of self-contained instruction.  By its terms, however, § 54749(a)(3) requires only that pupils receive 240 minutes of instruction per day.  See § 54749(a)(3) ("[A] county office of education may claim the statewide average revenue limit per unit of average daily attendance for high school districts ... for the attendance of pupils receiving services in the Cal-SAFE program, provided that no other revenue limit funding is claimed for the same pupil and pupil attendance of no less than 240 minutes per day is computed and maintained pursuant to Section 46300.").  Moreover, while § 46300(a) does require that pupils enrolled in Cal-SAGE programs be "under the immediate supervision and control of an employer of the district or county office who possessed a valid certification document, registered as required by law," see § 46300(a), it does not appear to require that the instruction be self-contained.  Indeed, the CDE guidelines which Flores cites and which Defendants rely upon state unequivocally: "COEs also have the option of providing academic services to Cal-SAFE students in self-contained classes."  (Flores Decl. ¶ 27, Ex. 1100, at 29 [Memorandum from Janet Sterling, the Director of the CDE School Fiscal Services Division, to Selected County and District Superintendents, Selected County and District Chief Business Officials, and Cal-SAFE Program Coordinators (Aug. 4, 2000), at 4].)  Accordingly, it is simply not apparent to the Court at this time that the cited regulations actually require that COEs provide the 240 minutes of instruction within self-contained classes.

29

1  protection claim so that they may depose David Flores and the LACOE

2  personnel responsible for the Program's funding, the Court need not

3  address the merits of Plaintiffs' or Defendants' arguments at this

4  time.[18]

5

6      C.  Due Process Claim

7      Because Plaintiffs' due process claim offers no additional

8  remedies and is merely an alternative ground for relief, the Court

9  will reach the merits of Plaintiffs' due process claim only if

10  Plaintiffs cannot prevail on their Title IX and equal protection

11  claims.

12

13  **IV.  CONCLUSION**

14      Because there are a genuine issues of material fact with respect

15  to the voluntariness of the Program and its comparability, Defendants'

16  Motion for Summary Judgment [36] is hereby DENIED with respect to

17  Plaintiffs' Title XI claim.  Moreover, because Plaintiffs are entitled

18  to a continuance to take discovery, Defendants' Motion for Summary

19  _____

20  [18] Although Plaintiffs have not specified what facts they hope to
    discover which, if discovered, would preclude summary judgment,

21  the Ninth Circuit has held that denial of a Rule 56(f) request
    for a continuance is inappropriate where "the material sought is

22  ... the subject of outstanding discovery requests."  VISA Int'l
    Serv. Ass'n. v. Bankcard Holders of Am., 784 F.2d 1472, 1475 (9th

23  Cir. 1986).  Here, Plaintiffs had noticed the depositions of
    David Flores and the other LACOE personnel responsible for the

24  Program's funding when the Court took those depositions off
    calendar so that the parties could prepare their summary judgment

25  motions.  Accordingly, the Court will grant a continuance so
    Plaintiffs can depose Flores and the others.  This is only fair

26  as the Program's funding appears to be the legitimate interest
    which Defendants are proffering and since knowledge of the

27  Program's funding is exclusively within the possession of Flores

28  and the LACOE personnel.

1  Judgment [36] is DENIED with respect to Plaintiffs' equal protection

2  claim.  However, Defendants may submit a renewed motion for summary

3  judgment with respect to Plaintiffs' equal protection claims upon the

4  completion of discovery.  Finally, the Court ORDERS the parties to

5  submit supplemental briefs addressing two (2) narrow issues: (1)

6  whether the private right of action under Title IX encompasses claims

7  under § 106.40 given the Supreme Court's decision in Alexander v.

8  Sandoval, 532 U.S. 275, 121 S. Ct. 1511 (2001), since the language of

9  § 106.40 seems at first blush to go beyond a mere prohibition on sex

10 discrimination, and (2) whether Title IX embodies a comprehensive

11 remedial scheme such that Plaintiffs' constitutional challenges are

12 barred by the Supreme Court's decisions in Middlesex County Sewerage

13 Auth. v. Nat'l Sea Clammers Ass'n, 453 U.S. 1, 101 S. Ct. 2615 (1981),

14 Smith v. Robinson, 468 U.S. 992, 104 S. Ct. 3457 (1984), and City of

15 Rancho Palos Verdes v. Abrams, 125 S. Ct. 1453 (2005).  To expedite

16 matters, the parties should submit simultaneous briefs on these issues

17 by no later than Tuesday August 9.  A hearing on the matter will be

18 held at 1:30 p.m. on Monday August 15.

19

20

21

22

23          IT IS SO ORDERED.

24

25 DATED: __7/27/05__          _____

26                                   STEPHEN V. WILSON

27                            UNITED STATES DISTRICT JUDGE

28